# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

| | |
|---|---|
| TRIPLE C MINERALS, LLC | CIVIL ACTION NO. 24-0004 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| XTO ENERGY, INC., ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

This matter is before the Court on cross-motions for summary judgment. Defendant XTO Energy, Inc. ("XTO") filed a Motion for Summary Judgment. See Record Document 40. Plaintiff Triple C Minerals, LLC ("Triple C") filed a Partial Motion for Summary Judgment. See Record Document 42. Both motions are opposed. See Record Documents 51 & 53. For the reasons set forth below, XTO's Motion for Summary Judgment (Record Document 40) is **GRANTED**, and Triple C's Partial Motion for Summary Judgment (Record Document 42) is **DENIED**. This case is hereby **DISMISSED**.

## FACTUAL BACKGROUND

The Court has independently reviewed each party's motion. The facts contained in this section are based on undisputed evidence and facts in the record, as this case presents a purely legal question at this stage of the litigation.

This dispute arises out of the termination of one portion of a larger mineral lease. See Record Documents 40 & 42. On February 15, 2005, XTO's predecessor-in-interest Acadian Land Services, LLC, entered into a mineral lease (the "Collins lease") with Archie R. Collins, et al. See Record Document 42-2. The Collins lease covers a total of 1,131.59 acres in Bienville Parish spread across ten semi-contiguous tracts located in Sections 6, 8, 16, 17, and 18 of Township 16 North, Range 9 West. See Record Document 42-6. Each

tract is referred to by number in Exhibit A to the lease. See id. at 3. Tract 1, consisting of 400 acres, lies entirely within Section 18. See id.

The Collins lease provides for a primary term of three years. See id. at 1. Additionally, there is an option to extend the primary term of the lease for two years. See id. at 4. The Collins lease is no longer within its primary term, nor was it within the primary term during any of the activity relevant to this case. See Record Document 42 at 2. Provision 6 of the Collins lease states:

> If within ninety (90) days prior to the end of the primary term, Lessee, should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulfur or other mineral is not being produced on said land or on land pooled therewith, but lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, Sulphur or other mineral from said land hereunder or from land pooled therewith.

Record Document 42-6 at 1. The Collins lease contains a lease form (Form Louisiana Spec. 14-BRI-2A-NL) and then "Exhibit A" which contains additional terms tailored to the parties. See id. If there were no additional terms to this lease and only the form lease applied, then under Provision 6, production or operations on any section of the property under the lease would maintain the entire lease. See id. at 1. However, the first clause in Exhibit A states, "[t]he following agreements and provisions shall supersede the provisions in the printed form text of this lease to the contrary and shall inure to the benefit

2

of and be binding upon the parties and their respective heirs, representatives, successors and assigns." Id. at 3. Exhibit A also contains a Pugh clause, which states:

> Two (2) years following the expiration of the primary term of this lease or the expiration of any extension or renewal of the primary term, whichever occurs last, in the event a portion or portions of the leased premises is pooled with other land so as to form a pooled unit or units. Operations on such unit or units will not maintain this lease in force as to the land not included in such unit or units. This lease may be maintained in force as to any land covered hereby and not included in such unit or units in any manner provided for herein.

Id. at 4.

In 2009, the Louisiana Office of Conservation issued a series of orders establishing five compulsory Haynesville Shale production units that collectively encompassed all of the acreage covered by the Collins lease. See Record Document 40-3 at 17–27. The relevant orders created the following units: HA RA SUW covering Section 6; HA RA SUH covering Section 16; HA RA SUG covering Section 8; HA RA SUT covering Section 17; and HA RA SUU covering Section 18. See id. Each unit was force-pooled under La. R.S. § 30:9 and assigned a specific unit well. Since 2009, XTO has operated wells in each of these units and has paid royalties to the lessors, including Triple C, for production attributable to their respective unit tracts. See Record Document 40-3 at 4–5.

Two wells were drilled in the HA RA SUU unit: 1) HA RA SUU; AR Collins 18 H Well #1, serial number 240772, spud February 12, 2010; and 2) HA RA SUU; AR Collins 18 H, serial number 247340 spud January 14, 2014, and completed May 25, 2014. See Record Document 1-3 at 6. It is undisputed that the wells listed above did not produce from January 1, 2022 – April 2022 and June 1, 2022 – February 28, 2023. See Record Documents 42-2 at 2 & 40-2 at 8. Although there was no production in Section 18 during

these periods, there was production in other Sections covered by the Collins lease. See Record Document 40-3 at 33–37.

Triple C filed suit in the 2nd Judicial District Court in Bienville Parish over the termination of one portion of a larger mineral lease. See Record Document 1-3. XTO removed the suit to this Court based on diversity and argues that the entire lease was maintained by production on some sections. See Record Documents 1, 1-3, 40. The case turns on the interpretation of the Pugh clause in the Collins lease.

## LAW AND ANALYSIS

### I.     Summary of the Arguments

Triple C contends that its lease with XTO terminated due to the 90-day periods without production or operations. See Record Document 1-3 at 10–11. Triple C asserts that the Pugh clause applies to compulsory pooled units and divides the lease on a unit-by-unit basis. See Record Document 42-1 at 6–7. Thus, maintenance of one section of the lease does not automatically maintain the other sections. See id. Triple C contends that because there was no production on Section 18 for two 90-day periods, Provision 6 of the lease applies. See Record Document 42 at 8. Further, production on other Sections during those 90-day periods does not maintain Section 18 due to the Pugh clause superseding the terms in the form lease. See id.

XTO argues that because the Pugh clause does not specifically state that it applies to compulsory pooled units, it should be interpreted against such application. See Record Document 40-1 at 4. Additionally, XTO contends that even if the Pugh clause was triggered, the Pugh clause does not divide the Collins lease on a pooled unit by pooled unit basis. See id. at 5. Thus, XTO argues that production on the wells in sections other

4

than Section 18 but still covered by the Collins lease maintains the entire Collins lease. See id.

Essentially, each party argues for a different interpretation of the Pugh clause in the Collins lease, and the case is dependent on the Court's interpretation of said clause. Because this issue can be determined based on the lease, which is part of the summary judgment record, this issue is appropriate for a decision at this stage. See Record Document 42-6.

## II. Summary Judgment Standard

A court should grant a motion for summary judgment when the pleadings "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In applying this standard, the court should construe "all facts and inferences in favor of the nonmoving party." Deshotel v. Wal-Mart Louisiana, L.L.C., 850 F.3d 742, 745 (5th Cir. 2017); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact as to issues critical to trial that would result in the movant's entitlement to judgment in its favor, including identifying the relevant portions of pleadings and discovery. See Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995). Courts must deny the moving party's motion for summary judgment if the movant fails to meet this burden. See id. If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." Id. (citing Celotex, 477 U.S. at 323). In evaluating motions for summary judgment,

courts must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational trier of fact to find for the non-moving party ...." Id.

When considering cross-motions for summary judgment, the court reviews each party's motion independently and views "the evidence and inferences in the light most favorable to the nonmoving party." Ryan, LLC v. Federal Trade Commission, 746 F.Supp.3d 369, 381 (N.D.Tex., 2024) (citing Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist., 912 F.3d 805, 811 (5th Cir. 2019)). "Cross-motions for summary judgment will not, in and of themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." Joplin v. Bias, 631 F.2d 1235, 1237 (5th Cir. 1980). The reasoning behind this rule is that "each party moving for summary judgment may do so on different legal theories depending on different constellations of material facts." Ryan, 746 F.Supp.3d at 381 (citing Bricklayers, Masons & Plasterers Int'l Union of Am., Loc. Union No. 15, Orlando, Fla. v. Stuart Plastering Co., 512 F.2d 1017, 1023 (5th Cir. 1975)). The evidence and facts in the record are undisputed, so this case presents a purely legal question at this stage of the litigation.

### III. Analysis

#### a. Exhibit A Supersedes the Terms of the Form Lease

The Court first addresses the hierarchy of the lease terms at issue. The Collins lease consists of a standard printed form lease followed by Exhibit A, which contains

additional negotiated provisions tailored to the parties. See Record Documents 42-6 & 42 at 3. If only the form lease applied, then under Paragraph 6, production or operations on any portion of the leased premises would maintain the lease in its entirety. See Record Document 42-6 at 1.

However, Exhibit A introduces a Pugh clause providing that operations on one pooled unit will not maintain the lease as to lands outside that unit. See id. at 4. This clause directly conflicts with Paragraph 6's continuation language. See id. at 1. Exhibit A also expressly states that, in the event of any inconsistency, the provisions of Exhibit A supersede those contained in the printed form lease. See id. at 3. Accordingly, the Court must interpret the Collins lease in a manner that gives controlling effect to Exhibit A where provisions are inconsistent. Thus, the Pugh clause governs the present dispute. The Court therefore turns to the two questions central to the parties' cross-motions: (1) whether the Pugh clause applies to compulsory pooled units created by the Office of Conservation; and (2) if so, whether it divides the Collins lease on a unit-by-unit basis for maintenance purposes.

    b. Applicable Law

XTO argues that the Pugh clause was not triggered because it applies only to voluntary pooled units created under the lease's pooling clause (Record Document 42-6 at 1 (Provision 7)), and not to compulsory units created by the Louisiana Office of Conservation. The Court agrees.

Louisiana law establishes that an oil and gas lease is an indivisible obligation unless the parties unambiguously agree otherwise. See La. R.S. § 31:114; Hunter Co. v. Shell Oil Co., 211 La. 893, 902 (1947). Louisiana Revised Statute § 31:114 states,

7

"[o]perations on or production from the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue the lease in force as to the entirety of the land burdened."

Aligning with this general principle of indivisibility, the Louisiana Supreme Court in Hunter found that the creation of compulsory units by the Office of Conservation cannot divide a mineral lease. See 211 La. at 904. The court refused to accept that an order by the Commissioner of Conservation could divide the obligations under a mineral lease and create two separate leases. See id. at 903.

A Pugh clause is a limited contractual exception to the statutory presumption of indivisibility found in La. R.S. § 31:114. It must therefore be strictly construed. Questar Exploration & Prod. Co. v. Woodard Villa, Inc., 123 So. 3d 734, 739 (La. App. 2 Cir. 2013). Courts apply Pugh clauses only where their text clearly limits the effect of production or operations on the remainder of the lease. See id. at 741.

That interpretive principle was first applied to compulsory unitization in Bennett v. Sinclair Oil & Gas Co., 275 F. Supp. 886 (W.D. La. 1967), aff'd, 405 F.2d 1005 (5th Cir. 1968). In Bennett, the Court found that the language of the lease made clear the Pugh clause applied only to voluntary pooling, not compulsory unitization. See id. at 893. The clause began with the phrase "if … lessee in its opinion deems it advisable and expedient…," which the Court interpreted as referring solely to pooling initiated by the lessee's discretion. Id. Because the units at issue were created by mandatory regulatory actions rather than voluntary acts of the lessee, the Court held the Pugh clause did not divide the lease. See id. Citing Smith v. Carter Oil Co. and Hunter, the Court emphasized that an oil and gas lease remains indivisible under compulsory unitization absent an

8

express provision to the contrary. See Bennett, 275 F. Supp. at 839; see also Smith, 104 F. Supp. 463 (W.D.La.1952); see also Hunter, 211 La. 893. Thus, production from within the compulsory units maintained all leased acreage, and the plaintiffs were not entitled to cancellation of the lease. See Bennett, 275 F. Supp. at 895. The United States Court of Appeals for the Fifth Circuit affirmed, explaining that compulsory unitization did not divide the mineral lease. See Bennett v. Sinclair Oil & Gas Co., 405 F.2d 1005, 1010 (5th Cir. 1968).

Subsequent decisions, including Lowman v. Chevron U.S.A., Inc., have followed Bennett's reasoning in holding that compulsory units established by the Commissioner of Conservation are not voluntary on the part of the lessee and therefore do not trigger the Pugh clause in a lease. 748 F.2d 320, 322 (5th Cir. 1984).

It is important to note that an official Comment to La. R.S. § 31:114 states that parties can contract around the indivisibility that the statute requires, which is "frequently done by the inclusion of a 'Pugh clause' in the lease, which effectively reverses the Hunter and LeBlanc decisions, with the result that if there is a unitization and production is obtained from the unit, the lease is maintained only as to that portion in the unit." See Hunter, 211 La. at 904; see also LeBlanc v. Danciger Oil & Refining Co., 49 So. 2d 855, 469–70 (La. 1950). Because Hunter and LeBlanc both dealt with compulsory units, it is clear from the Comments to La. R.S. § 31:114 that a Pugh clause can be drafted in a way that allows division of a mineral lease upon the creation of compulsory units. See Hunter, 211 La. at 904; see also LeBlanc, 49 So. 2d at 469–70. However, to align with the jurisprudence, for a Pugh clause to apply to compulsory units, the clause must be drafted to clearly apply to compulsory units.

9

    c. <u>Application to the Collins Lease</u>

The Court finds that the Pugh clause in the Collins lease is not triggered by compulsory unitization. Triple C contends that the Pugh clause here is broader than the one in <u>Bennett</u> because it appears in Exhibit A rather than in the body of the pooling clause and refers generally to "pooled unit or units" without language limiting its application to voluntary units. <u>See</u> Record Document 42-6 at 4; <u>see also</u> <u>Bennett</u>, 275 F. Supp. at 892–94. Although this point is well-taken, the Court concludes that this distinction does not overcome controlling precedent or Louisiana's strong statutory presumption of indivisibility.

The Collins lease contains only one express pooling authority, Paragraph 7 of the form lease, which authorizes the lessee to voluntarily pool acreage. <u>See</u> Record Document 2-6 at 1. Neither Paragraph 7 nor Exhibit A mentions compulsory pooling or the Commissioner of Conservation. <u>See</u> Record Document 42-6. Thus, even if the Pugh clause in Exhibit A is textually separate, it still refers to the same type of "pooled unit" that the lease itself authorizes the lessee to create. As in <u>Bennett</u>, the lease simply provides no textual basis for extending the clause to compulsory units. 275 F. Supp. at 892–94.

Additionally, Triple C urges the Court to use the general principles of contract interpretation under Louisiana law and consider extrinsic evidence in interpreting the lease. While the Court acknowledges the general Louisiana Civil Code principles requiring ambiguous contracts to be interpreted against the drafter and in light of the parties' common intent, those principles yield where longstanding mineral law jurisprudence sets a more specific interpretive rule. <u>See</u> La. Civ. Code arts. 2056 & 2045–47. Because a Pugh clause operates as an exception to La. R.S. § 31:114's statutory

presumption of indivisibility, ambiguity as to its applicability to compulsory units should be resolved against the party seeking to sever the lease. Although not an expressly stated principle of Louisiana law, the strong mandate of indivisibility pronounced in <u>Hunter</u> and the cases that followed it, the Court finds that when the lease's language leaves doubt whether the parties intended the clause to cover compulsory units, that doubt is resolved by maintaining the lease's indivisibility. 211 La. at 903; <u>see</u> <u>Bennett</u>, 275 F. Supp. at 893.

The Court finds that it is inappropriate in this case to consider extrinsic evidence in interpreting the Collins lease. Under Louisiana Civil Code article 2046, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." The use of extrinsic evidence is reserved for situations involving ambiguity. <u>See</u> La. Civ. Code art. 2053. Here, the language of the Collins lease Pugh clause clearly provides that it applies to voluntary units. <u>See</u> Record Document 42-6 at 4. The lease contains no reference to compulsory unitization. <u>See id.</u>

Louisiana jurisprudence interpreting Pugh clauses has consistently applied these Civil Code principles by strictly construing such clauses and declining to extend their effect beyond what the text clearly provides. <u>See</u> <u>Hunter</u>, 211 La. at 903; <u>see also</u> <u>Bennett</u>, 275 F. Supp. at 893. Because the Collins lease does not expressly or unambiguously state that its Pugh clause applies to compulsory units, the Court concludes that there is no ambiguity on that point. Accordingly, there is no basis to consider extrinsic evidence to determine the parties' intent.

The Court agrees with Triple C that there is no brightline rule in Louisiana providing that a Pugh clause can never apply to compulsory unitization. <u>See</u> Record Document 51

at 4. That is entirely correct—a Pugh clause can extend to compulsory units. However, as the jurisprudence makes clear that when a Pugh clause is intended to apply to compulsory units, the language of the lease must clearly and unequivocally express that intent. See Bennett, 275 F. Supp. at 891–92 (W.D. La. 1967). This Court does not purport to establish a new rule under Louisiana law as to what language is required for a Pugh clause to apply to compulsory unitization. The Court's ruling is limited to the Collins lease, whose Pugh clause lacks the clarity necessary to encompass compulsory units. Thus, XTO's Motion for Summary Judgment (Record Document 40) is **GRANTED** and Triple C's claims are **DISMISSED**. Further, Triple C's Partial Motion for Summary Judgment (Record Document 42) is **DENIED**.

    d.  <u>Unit-by-Unit Basis</u>

In light of the Court's holding that the Pugh clause was never triggered, the parties' competing arguments over whether it divides the lease on a "unit-by-unit" basis or merely between unitized and non-unitized acreage are moot.

## CONCLUSION

Based on the reasons explained above,

**IT IS ORDERED** that XTO's Motion for Summary Judgment (Record Document 40) is **GRANTED**. All claims against XTO are **DISMISSED**.

**IT IS FURTHER ORDERED** that Triple C's Partial Motion for Summary Judgment (Record Document 42) is **DENIED**.

An judgment consistent with this ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 21st day of November, 2025.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE